UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JAMES RONALD BEATY, A/K/A<br>JAMES RONALD BEATTY,<br><br>Defendant | Criminal Case No. 10-CR-10439-NG |

## GOVERNMENT'S SENTENCING MEMORANDUM

The numbers are impressive.

In 9½ short months, Defendant obtained $529,176 in fraudulent credit with which he fraudulently purchased $289,713.77 in gift cards and merchandise.  PSR ¶¶ 9-10.  Doing so affected multiple branches of 18 chain stores and 1 bank in 12 states.  He obtained identity cards in the names and identities of 100 people, opened credit lines using 67 of these people's identities, and used credit using 63 of their identities.  PSR ¶ 9.

These numbers depict an identity thief who caused a lot of damage to a lot of people and stores over a wide geographic area in a relatively short period.

Several other numbers complete the story of the man himself.  After Defendant was arrested (and unfortunately released) for the present crime, he spent almost 2 months avoiding recapture and turned himself in only after investigators started questioning a relative about the relative's role in the offense.  PSR ¶¶ 24-30.  This is Defendant's 4th conviction and incarceration for identity theft.  *See* PSR ¶¶ 80 (federal conspiracy to commit identity theft in 1999), 81 (state charges for using a fraudulent credit card in 2006), 82 (state identity theft in 2009).  He

1

committed the present identity thefts while on probation for the 2009 identity theft. PSR ¶¶ 82, 84.

These numbers depict an identity thief who would have continued to victimize people had he not been caught (or had the investigators not started questioning his family), and who will not stop committing identity theft until he is imprisoned for a significant period. Rehabilitation is unlikely. The goals of sentencing should be incapacitation and punishment, with specific and general deterrence.

The United States therefore moves this Court to sentence Defendant Beatty to 84 months of imprisonment; 36 months of supervised release; a $7,500 fine; forfeiture as agreed upon in the plea agreement; restitution of $289,713.77 to the defrauded companies, $24 to J.A.S. (an individual victim), and $120 to S.C. (another individual victim); and a $200 special assessment.

This long sentence is appropriate to keep Defendant away from stores, fake identity cards, and fraud. Defendant's willingness to violate probation demonstrates that letting him out sooner will only lead to more fraud.

**Background of the Defendant and the Offense**

The facts recounted above tell most of the material facts about how Defendant committed the crime. Defendant obtained fraudulent identity cards in Boston, used the cards to open fraudulent credit accounts at stores and banks, and then used the accounts to purchase merchandise and gift cards. PSR ¶¶ 9-10.

The scope of Defendant's scheme is astonishing. As set forth above, in 9½ short months, Defendant obtained $529,176 in fraudulent credit and used $289,713.77 of that credit for fraudulent purchases. PSR ¶¶ 9-10. He carried out the fraud in over a fifth of the states, moving

throughout New England (Maine, New Hampshire, Vermont, Connecticut), the mid-Atlantic region (New York, Pennsylvania), a brief hop to the Midwest (Ohio), and down into the South (Tennessee, Virginia, West Virginia, South Carolina, and North Carolina).  PSR ¶ 10.  He obtained the credit from multiple branches of 18 chain stores and one bank.  PSR ¶ 10.  He obtained identity cards in the names and identities of 100 people, opened credit lines using 67 of these people's identities, and used credit using 63 of their identities.  PSR ¶ 9.

Defendant would have continued the fraud had the authorities not started asking about his relative's role in the affair.  *See* PSR ¶¶ 24-30.  He is an unrepentant recidivist.  He commits more sophisticated crimes as the years wear on.  After years of vehicle offenses dating back to 1983, *see* PSR ¶¶ 54, 56, 60, 64, 69, 70, 73, 74, 76, 77, 79, and years of petty theft and petty frauds dating back to 1986, *see* PSR ¶¶ 57, 58, 60, 62, 63, 65, 66, 67, 68, 69, 71, 72, 75, 78, Defendant got serious about his theft in 1995.  In 1995, Defendant shoplifted almost $6,500 worth of clothing, hit an officer with his car door and then engaged in a high-speed chase while trying to escape.  PSR ¶ 79. Since the late 1990s, his crime of choice has been identity theft; his last three convictions before the present one were for some type of identity theft.  In 1999, Defendant was sentenced to 20 months of imprisonment for federal conspiracy to commit identity theft.  PSR ¶ 80.  That sentence did not deter him.  In 2006, Defendant was convicted of theft offenses in North Carolina for fraudulent credit card purchases.  PSR ¶ 81. That sentence did not deter him, either.  In 2009, Defendant was convicted in North Carolina of state identity theft charges that largely parallel the allegations in the present case.  PSR ¶ 82.  That sentence especially did not deter him: he was on probation for that offense when he committed the present crime.  PSR ¶¶ 82, 84.  He obtained his probation officer's approval to move to Massachusetts by

lying that he would obtain work up here. PSR ¶ 82. In fact, obtaining work up here may not have been a lie: Defendant did find profitable work up here, just not lawful work.

All these facts demonstrate that Defendant is a recidivist. If he is out, he will steal.

There are no grounds for leniency. Although much of Defendant's earlier criminal history might be attributable to early drug problems, he has not been on drugs since 1992. *See* PSR ¶ 121. This point bears emphasis: drugs are not the culprit. Defendant was sober when he committed identity theft over and over again. Nor is Defendant's recent unemployment the culprit. Defendant was mostly employed while he committed crimes after 1992. *See* PSR ¶¶ 126a-132. And if in 2010 Defendant committed crimes to replace his welding income lost to unemployment, committing $289,713.77 in a multi-state, multi-victim identity theft scheme was an extravagant substitute.

Again, there are no grounds for leniency.

**The Lenient Sentencing Guideline Calculations and Lenient Plea Agreement**

Yet Defendant has received a fairly lenient deal. It is lenient in two ways: the Guidelines loss calculation and the choice of charges and agreed-upon sentencing range.

The leniency starts with the Guidelines calculations, in particular the loss calculation. The loss calculated is the actual loss or intended loss, whichever is higher. U.S.S.G. § 2B1.1 cmt. app. n.3(A). The actual loss is the value of the goods and gift cards that Defendant purchased, whereas the intended loss is the amount of credit he obtained. *Cf. United States v. Alli*, 444 F.3d 34, 36-39 (1st Cir. 2006) (computing intended loss from defendant's theft of mail containing credit cards for purposes of selling them, by adding up the credit limits of the credit cards). In this case, the higher amount is the intended loss, $529,176 in fraudulent credit

obtained, rather than the actual loss of $289,713.77 in credit used. Probation used the lower amount, and the Government, seeking to be conservative, did not object. The difference gives Defendant a Guidelines score that is two levels lower. *Compare* U.S.S.G. § 2B1.1(b)(1)(G) (12 levels for loss between $200,000 and $400,000) *with* U.S.S.G. § 2B1.1(b)(1)(H) (14 levels for loss between $400,000 and $1,000,000). So the Guidelines figure is lenient.

Why use loss at all? Because loss approximates the amount of harm Defendant caused and intended to cause. To be sure, sometimes the loss overstates culpability, such as the culpability of a secretary who enables a corporate executive's fraud without sharing the profits, or the culpability of a pickpocket who lifts a wallet with $50,000 in cash rather than the expected $50. But here, all the loss went directly into Defendant's pocket, and the loss consists of a series of fraudulent transactions repeated over 9½ months rather than a momentary windfall. So here the loss appropriately approximates Defendant's culpability.

The Guidelines calculation also includes a 4-level upward adjustment because there were more than 50 victims. PSR ¶ 42; U.S.S.G. § 2B1.1(b)(2)(B). Why do this? Because there is a difference between stealing $289,713.77 from one store or nineteen, and between using the identities of 1 person or 63. The more victims, the more human anguish and toil the victims suffer to set things right.

The Guidelines calculation also includes a 2-level upward adjustment for using sophisticated means. PSR ¶ 43; U.S.S.G. § 2B1.1(b)(9). This adjustment is appropriate because by hopping between jurisdictions, Defendant decreased the chance that he would be prosecuted for the whole scheme in any one jurisdiction. Defendant worked hard for his money, and his Guidelines score should represent his criminal industriousness.

Taken altogether, Defendant's total offense level, after accounting for acceptance of responsibility is a 21, PSR ¶ 49, although again, there is an argument that because of the credit obtained, the Guideline level could have been a 23.

Defendant's criminal history category of IV shows him to be a long-time, unrepentant thief and identity thief.  His criminal history category arguably understates his criminal record, which includes about 15 years' worth of unscored convictions.  *See* PSR ¶¶ 54-79.  Nonetheless, the Government sees no need to press the issue.

With an offense level of 21 and a criminal history category of IV, Defendant's Guidelines range is 57-71 months.

In addition, Defendant is subject to a 24-month consecutive sentence because of the aggravated identity theft conviction under 18 U.S.C. § 1028A.  This penalty is appropriate because it recognizes the particular toll that identity theft takes on its individual victims.  Identity theft is different from, for example, car theft.  When someone steals your car, you call your insurance company, make a claim, buy a new car, and the crime and its effects are over.  When someone steals your identity, the effects reverberate for a long time.  Good luck getting your life back.  First you have to prove that you did not make the charges.  Then you have to cancel accounts and change passwords.  Then you have to call the credit bureaus to find out about additional accounts and put fraud alerts on your credit history.  Then you have to wait to see whether any more fraudulent accounts pop up.  And then you have to explain to suspicious potential creditors that those fraudulent charges really were not yours, and you have to do so again and again.  And throughout, you feel like your good name has been sullied.  The victim impact statements of J.A.S. and D.C.D. capture that frustration succinctly.  According to J.A.S.,

"I had to get a 'Notary Public' to sign 9 affidavits to explain to several companies that I did not owe this money that I was billed for." According to D.C.D., "What a tru[]ly hideous crime. I have worked hard to protect my personal information throughout my entire life. I feel extremely violated that some group now has all of this information. . . . [¶] I have invested many hours of my time in phone calls to police and credit card companies. I still feel extremely violated and often wonder if this is really over." J.A.S.'s story is especially sad: "This was very stressful to me. I am being treated for Prostate Cancer and I believe the stress did not help as my PSA numbers began to climb faster than they had done in the past 5 years. Stress and depression can affect these numbers." This is why the two-year consecutive penalty is appropriate.

Putting these numbers together, the Guidelines recommend a sentence of 81 to 95 months (57 to 71 months plus 24 months consecutive).

This is the second aspect in which the Government was lenient: it agreed to a set of charges and a sentencing range that cap Defendant's sentence at 7 years, or 84 months. So, assuming that the Court approves the plea agreement, the Government already took the middle and the high end of the Guidelines sentencing range off the table.

**The Sentencing Recommendation**

In this case, Defendant's Guidelines calculation and his criminal history category result in a Guidelines range that accurately approximates Defendant's culpability and his likelihood of returning to crime once he goes free. In fact, because the loss calculation is low and his criminal history category might understate his criminal history, Defendant's Guidelines range is likely more generous to him than a serial identity thief might expect.

For these reasons, the Court should sentence Defendant to 84 months of imprisonment, to

be followed by 36 months of supervised release. At this point, incapacitation and specific deterrence are more important than betting on rehabilitation.

The sentence should be accompanied by a $7,500 fine. Defendant has a couple of cars, including a Mercedes, and a house that he rents to tenants. PSR ¶¶ 138-142. Thus, unlike many defendants, Beatty has some assets with which he can pay a small fine. $7,500 is a pittance compared to what he stole, but it will serve as a tangible reminder not to do it again.

The sentence should also be accompanied by forfeiture, as agreed up on in the plea agreement, and restitution of $289,713.77 to the defrauded companies, $24 to J.A.S. (an individual victim), and $120 to S.C. (another individual victim). PSR ¶¶ 163-165. A $200 special assessment is also due.

Respectfully submitted,

Carmen M. Ortiz
United States Attorney

By:  */s/ Scott L. Garland*
Scott L. Garland
Assistant U.S. Attorney

CERTIFICATE OF SERVICE

I hereby certify that this document, which is being filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Scott L. Garland*
Scott L. Garland
Assistant U.S. Attorney

Date: June 15, 2011